UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, | ) | |
| Aidan Forsyth, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 23 C 4875 |
| v. | ) | |
| | ) | Judge Shah |
| KSO METALFAB, INC., and DORA | ) | |
| KUZELKA, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT IN INTERVENTION**

Plaintiff, the United States of America, on behalf of the U.S. Small Business Administration (SBA), by its attorney, Andrew S. Boutros, United States Attorney for the Northern District of Illinois, files this complaint in intervention against defendants KSO MetalFab, Inc. ("KSO") and Dora Kuzelka to recover treble damages, civil penalties, and costs under the False Claims Act (FCA), 31 U.S.C. §§ 3729–33, and to recover damages and other monetary relief under the common law and equitable theory of unjust enrichment, in connection with federally guaranteed Paycheck Protection Program (PPP) loans improperly obtained by KSO through its and the other defendant's actions.

### **Introduction**

1.        KSO and its owner and/or officer or director Dora Kuzelka made false or fraudulent statements and caused false claims and false records to be submitted to the United States to obtain federally guaranteed PPP loans.  Specifically, despite the fact that Dora Kuzelka who held a greater-than-20% interest in the company, was the subject of criminal charges at the time KSO initially applied for a PPP loan, KSO's loan application—which was signed by  D o r a

Kuzelka—falsely certified (1) that there was no individual owning 20% or more of the company's equity who was the subject of such charges, and (2) that KSO was eligible to receive a loan under the applicable PPP rules. These certifications were materially false because Dora Kuzelka was at that time an owner of more than 20% of the company's equity and was the subject of a criminal complaint filed in federal court. This rendered KSO ineligible for a PPP loan.

2.      KSO later applied for a Second Draw PPP loan, at which time Dora Kuzelka again certified that KSO was eligible to receive a loan under the applicable PPP rules. This certification was also false—KSO's ineligibility for the initial loan rendered it ineligible to receive a Second Draw loan—and again KSO's second loan application failed to disclose that Dora Kuzelka, who owned at least 20% of the company's equity, was the subject of a criminal complaint filed in federal court at the time the application was signed and submitted.

3.      As a result of the defendants' false statements, false records, and fraud, KSO obtained two PPP loans that it was not eligible for, and this ultimately caused the United States to sustain losses of approximately $843,941 for the loan principal and interest amounts that were forgiven for each loan under the PPP, plus the processing fees that were paid by the SBA to the issuing bank for each loan, for a total loss of $868,943.

**Jurisdiction and Venue**

4.      This court has jurisdiction pursuant to 28 U.S.C. § 1345, 31 U.S.C. §§ 3730 and 3732, and 28 U.S.C. § 1367(a).

5.      This court has personal jurisdiction over the defendants, and venue is proper in the Northern District of Illinois, pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391 and 1395, because at all times material to the allegations in this complaint, the defendants transacted business,

could be found in, and/or resided in the Northern District of Illinois, and a substantial part of the events or omissions giving rise to the claim occurred here.

## Parties

6.        Plaintiff is the United States, on behalf of the SBA, which administered the PPP.

7.        Relator Aidan Forsyth filed this suit as a *qui tam* action on behalf of the United States.

8.        Defendant KSO MetalFab, Inc. is a privately held Illinois corporation located in Streamwood, Illinois.

9.        Defendant Dora Kuzelka is an individual who resides in Elgin, Illinois.  She was previously the record owner of 51% of KSO's shares and was the company's president in 2021.

## Legal Background

### A.        The CARES Act and Paycheck Protection Program

10.        On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. 116-136, was enacted to provide emergency assistance for individuals, families, and businesses affected by the COVID-19 pandemic.  Section 1102 of the CARES Act temporarily permitted the SBA to guarantee 100 percent of loans made by participating lenders under a new program known as the PPP pursuant to section 7(a)(36) of the Small Business Act (15 U.S.C. § 636(a)(36)).  Section 1102(F)(ii)(I) of  the CARES Act stated that PPP lenders were deemed to have been delegated authority by the SBA Administrator to make and approve PPP loans.  And section 1106 of the CARES Act provided for forgiveness of loans guaranteed under the PPP.

11.        To obtain a PPP loan, a business, through its authorized representative, signed and submitted a PPP loan application to the lender with delegated authority from the SBA, using

the SBA Form 2483 loan application form. The loan application form required the applicant to acknowledge the PPP program rules and make certain affirmative certifications regarding program eligibility, including as shown here:

**By Signing Below, You Make the Following Representations, Authorizations, and Certifications**

CERTIFICATIONS AND AUTHORIZATIONS

I certify that:

- I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.
- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule).

12.     Under the PPP, lenders were generally allowed to rely on borrowers' certifications regarding program eligibility and use of loan proceeds, and to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness.

13.     If the lender approved the borrower's application, the lender submitted information from the borrower's loan application form to the SBA via the agency's electronic "ETran" processing system. Based on the lender's electronic submission, the loan was assigned a loan number, and the SBA provided a loan guarantee to the lender.

14.     A PPP borrower could later apply for loan forgiveness, which required the borrower to certify that the loan had been used for authorized purposes and that other PPP requirements were met. As with the initial loan applications, loan forgiveness applications could be submitted to the lender, and if the lender determined that the requirements for forgiveness were met, it would submit the loan forgiveness application to the SBA. The great bulk of loan forgiveness applications were subject only to "auto review" by the SBA's computer system, meaning that if the appropriate certifications and other information had been provided, forgiveness would be approved and the SBA would remit payment to the lender for the principal amount of the loan, plus interest.

4

**B.     PPP Eligibility Requirements**

15.     Consistent with the rules governing SBA's section 7(a) loan program generally, which has long limited loan eligibility for persons with (or companies with owners with) pending criminal charges or other criminal histories, PPP loans were subject to several rules and eligibility restrictions, including restrictions relating to criminal charges and criminal history.

16.     As relevant here, a company was ineligible to obtain a PPP loan if any individual owning 20% or more of the company's equity was subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought, or was presently incarcerated or on probation.  These requirements were the subject of a "yes or no" question on the application form promulgated by the SBA for PPP loans, with a warning that if the answer was "yes," the loan would not be approved, as shown here:

*If questions (5) or (6) are answered "Yes," the loan will not be approved.*

| | Question | Yes | No |
|---|---|---|---|
| 5. | Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation or parole? | ☐ | ☐ |
| | Initial here to confirm your response to question 5 → _____ | | |

17.     In addition, the text of an interim final rule issued by the SBA to implement the PPP likewise stated that a business would be ineligible if any "owner of 20 percent or more of the equity of the applicant is incarcerated, on probation, on parole; presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction; or has been convicted of a felony within the last five years."  The interim final rule also stated that businesses of the type identified in 13 C.F.R. § 120.110 and in Subpart B, Chapter 2, of the SBA's Standard Operating Procedure (SOP) 50 10 were ineligible for PPP loans. Section 120.110 rendered a loan applicant ineligible if it had any "Associate"—which was defined as any officer, director, key employee, or holder of 20% or the company's equity, *see* 13 C.F.R. §

5

120.10—"who is incarcerated, on probation, on parole, or is under indictment for a felony or a crime of moral turpitude." 13 C.F.R. § 120.110(n). And SOP 50 10 more broadly required any such "Associate" of a company to be of "good character," which requirement, among other things, (1) barred the provision of financial assistance to any company with an Associate "[c]urrently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brough in any jurisdiction," and also (2) barred the disbursement of any loan to a company with an Associate with a misdemeanor conviction within 6 months of the loan application or a felony conviction. *See* SOP 50 10 5(K), Subpart B, Chapter 2, § 3.A.13.

18. A final eligibility provision that is relevant here relates to so-called "Second Draw" loans under the PPP, which were essentially a second round of PPP loans authorized by Congress as part of the Economic Aid Act of 2021. An interim final rule issued by the SBA to implement the Second Draw Loan portion of the PPP stated that "an entity that is ineligible to receive a First Draw PPP Loan under the CARES Act or Consolidated First Draw PPP IFR is also ineligible for a Second Draw PPP Loan," with subsection (e)(1) of the interim final rule "ensur[ing] that a borrower that received a First Draw PPP Loan despite being ineligible to receive the loan is not eligible to receive a Second Draw PPP Loan."

## C.    The False Claims Act

19. Originally enacted in the 1863 to combat fraud against the Union Army during the Civil War, the False Claims Act is the primary tool with which the United States combats fraud against the government and protects the federal fisc. The Supreme Court has held that the FCA's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

20.     The FCA establishes liability for various forms of conduct related to the submission of a false or fraudulent claim for payment from the federal government. The FCA imposes liability for knowingly presenting false claims for federal funds, or for causing such false claims to be presented. 31 U.S.C. § 3729(a)(1)(A). The statute also establishes liability for knowingly making, using, or causing a false record or statement material to a false claim for federal funds. *Id.* § 3729(a)(1)(B).

21.     The terms "knowing" and "knowingly" are defined by the FCA to mean that, with respect to the subject false information, a person has actual knowledge of the falsity, acts in deliberate ignorance of the truth or falsity, or acts in reckless disregard of the truth or falsity, with proof of specific intent to defraud not required. *Id.* § 3729(b).

22.     As defined in the FCA, the term "claim" means any request or demand for money or property that is presented or caused to be presented to the United States; or that is made to a contractor, grantee, or other recipient, if the money is to be spent or used on behalf of the government or to advance a government program or interest, so long as the United States provides or has provided any portion of the subject money or property or will reimburse such contractor, grantee, or other recipient for any portion of the subject money or property. *Id.*

23.     The term "material" is defined in the FCA to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. *Id*

24.     The FCA provides for a recovery of three times the damages sustained by the United States (treble damages), plus a civil penalty for each violation. *Id.* § 3729(a)(1). Pursuant to the Bipartisan Budget Act of 2015, all civil statutory penalties, including those set forth in the FCA, are required to be adjusted annually for inflation. *See* Pub. Law. No. 114-74, § 701, 129 Stat. 584, 599. At this time, FCA penalties assessed after February 12, 2024, whose associated

violations occurred after November 2, 2015, are no less than $13,946 and no more than $27,894 for each violation. *See* 28 C.F.R. § 85.5.

<strong>Defendants' Fraudulent Activity</strong>

25.     KSO was (and is) a metal fabricating company doing business in the Northern District of Illinois. As of 2021 and continuing into at least June 2022, its majority shareholder and president was Dora Kuzelka.

**A. KSO's Scheme to Employ Illegal Aliens.**

26.     On April 11, 2017, the United States Department of Homeland Security Investigations ("HSI") issued a notice of inspection to Dora Kuzelka's son, Kenneth Kuzelka, another of KSO's managing owners. At the time of the Notice, KSO's workforce was comprised of approximately 67 employees. Based on HSI's investigation, approximately 36 of the 67 employees were aliens as defined by Section 1324a, meaning that they were without legal status or authorization to work in the United States, and HSI provided to Kenneth Kuzelka, Dora Kuzelka, and KSO's human resources manager, a list identifying the 36 employees. The 36 employees were long-term KSO employees who were personally known by Kari Kuzelka (Dora Kuzelka's daughter), Kenneth Kuzelka, Dora Kuzelka, and Keith Kuzelka, Dora Kuzelka's son.

27.     Beginning in May 2017, and continuing until October 2019, at Streamwood, in the Northern District of Illinois, Eastern Division, Dora Kuzelka, Kenneth Kuzelka, Kari Kuzelka, Keith Kuzelka, and Sergio Badani, who was an officer of a staffing company, employed several unauthorized aliens as temporary workers pursuant to a labor contract entered into by KSO and the staffing company, knowing that the aliens had come to the United States in violation of law.

28.     Dora Kuzelka signed a letter that KSO sent on or about September 14, 2017, to HSI listing the illegal alien employees and their dates of termination from KSO employment. Also,

at a meeting with government officials on March 22, 2018, Dora Kuzelka, Kenneth Kuzelka, and Keith Kuzelka falsely informed the government that all 36 employees had been terminated by KSO. In fact, some of these undocumented workers had already been rehired by KSO through a staffing company and plans were in place to rehire and continue to employ more undocumented employees.

29.     Among other things, Dora Kuzelka oversaw some of the overtime payments for the illegal alien employees. In general, KSO paid for overtime above 50 hours per week in cash, paying employees' normal hourly wage plus $2 with no payroll deductions withheld.  Dora Kuzelka also provided a KSO corporate credit card to one of the illegal alien employees, in lieu of returning her to the KSO official payroll, and permitted that employee to spend a specified amount on personal charges using the KSO corporate card. Dora Kuzelka is the primary card holder on the card.

30.     Knowing the illegal nature of the rehiring and continued employment of the undocumented workers, Dora Kuzelka nevertheless continued to own, manage, and work at KSO and facilitate KSO's continued employment of several undocumented employees identified by the government.  Dora Kuzelka knew that these employees were in the United States illegally and remained and were employed in the United States in violation of the law.

**B. Criminal Charges Are Filed Against KSO's Owners.**

31.     On October 11, 2019, Dora Kuzelka, Kenneth Kuzelka, Kari Kuzelka, and Keith Kuzelka were charged by criminal complaint with conspiracy to commit alien harboring for purposes of commercial advantage, in violation of Title 8, United States Code, Sections 1324(a)(l)(A)(v)(I) and 1324(a)(l)(B)(i) (Count 1); alien harboring for purposes of commercial advantage, in violation of Title 8, United States Code, Sections 1324(a)(l)(A)(iii), (a)(l)(A)(v)(II) and (a)(l)(B)(i) (Counts 2-11); and engaging in the pattern and practice of hiring unauthorized aliens, in violation of Title 8, United States Code, Sections 1324a(a)(l)(A), 1324a(a)(2) and 1324a(f)(l) (Count 12).

32.     On May 3, 2022, Kari Kuzelka pled guilty to the charge of engaging in a pattern and practice of hiring illegal aliens, in violation of Title 8, United States Code, Sections 1324a(a)(1)(A), 1324a(A)(2) and 1324a(f)(1), and Kenneth Kuzelka pled guilty to conspiracy to commit alien harboring for purposes of commercial advantage, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i).  Other Kuzelka family members also pled guilty to charges related to harboring illegal aliens.

33.     On May 3, 2022, Dora Kuzelka entered into a non-prosecution agreement whereby the government agreed to defer prosecution of the charges set forth above for 18 months for the purposes of allowing Dora Kuzelka to demonstrate good conduct during this period.

34.     On December 22, 2022, Kari and Kenneth Kuzelka were sentenced to probation for a term of two years and fined $3,000 and $50,000, respectively, for some or all the criminal charges described above.

**C. KSO's Application for and Receipt of PPP Loans**

The First Draw Loan

35.        Meanwhile, on March 16, 2021, while the above referenced criminal charges were pending against Dora Kuzelka, Dora Kuzelka, on behalf of KSO, submitted a PPP loan application to Itasca Bank and Trust Company (a delegated PPP lender) seeking a loan in the principal amount of $416,727 (hereinafter the First Draw Loan).  The application for the First Draw Loan was signed by Dora Kuzelka (identified as the company's president).

36.        Question number 5 on the application for the First Draw Loan asked, "Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation or parole?"  The application also expressly stated, "If questions (5) or (6) are answered 'Yes,' the loan will not be approved."

37.        Despite the pending criminal charges against Dora Kuzelka discussed above, the "No" box was checked for question number 5, which was initialed by Dora Kuzelka, as shown here:

| _If questions (1), (2), (5), or (6) are answered "Yes," the loan will not be approved._ | | |
|---|---|---|
| **Question** | Yes | No |
| 5. Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant presently incarcerated or, for any felony, presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction?<br>Initial here to confirm your response to question 5 → | | ✓ |

38.        The application for the First Draw Loan that Dora Kuzelka signed also required a certification that "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by SBA implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act

11

(CARES Act) (the Paycheck Protection Program Rule)." KSO was in fact not eligible under the relevant PPP rules, due to the criminal charges against Kuzelka. Nonetheless, Kuzelka signed the certification.

39.      The application for the First Draw Loan also required the applicant to list "all owners of 20% or more of the equity of the Applicant" and to provide the percentage ownership of each. KSO's application disclosed Dora Kuzelka's ownership interests as 51%.

40.      Based on KSO's First Draw Loan application and the eligibility certifications therein, Itasca Bank and Trust Company electronically submitted information about the application to the SBA, causing the assignment of an SBA loan number and a loan guarantee under the terms of the PPP, and disbursed the loan in the amount of $416,727 to KSO. Based on this loan, the SBA paid Itasca Bank and Trust Company a $12,501 process fee.

41.      KSO subsequently applied for forgiveness of its First Draw Loan, which caused the submission to the SBA of a Form 3508EZ loan forgiveness application on or about June 22, 2022. On this application, Dora Kuzelka, as KSO's owner, certified that "[t]he information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects."

42.      On June 29, 2022, SBA approved forgiveness of KSO's First Draw Loan and remitted a payment of $422,121 (consisting of the loan principal amount of $416,727 plus accrued interest) to Itasca Bank and Trust Company.

The Second Draw Loan

43.      On April 6, 2021, KSO submitted a second PPP loan application to Itasca Bank and Trust Company seeking a loan in the principal amount of $416,727 (hereinafter the Second

Draw Loan). The application for the Second Draw Loan was signed by Dora Kuzelka, identified as the company's president.

44.     The application for the Second Draw Loan required a certification that "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) and the Department of the Treasury (Treasury) implementing the Second Draw Paycheck Protection Program Loans under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) and the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the Paycheck Protection Program Rule)." KSO was in fact not eligible under the relevant PPP rules at the time, because it had been ineligible for a First Draw Loan as discussed above. Nevertheless, Dora Kuzelka signed the certification.

45.     Also, despite the pending criminal charges against Dora Kuzelka discussed above, the "No" box was checked for question number 4, which was initialed by Dora Kuzelka, as shown here:

*If questions (1), (2), (4), or (5) are answered "Yes," the loan will not be approved.*

| Question | Yes | No |
|---|---|---|
| 4. Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant presently incarcerated or, for any felony, presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction?<br>Initial here to confirm your response to question 4 → | | ✓ |

46.     The application for the Second Draw Loan also required the applicant to list "all owners of 20% or more of the equity of the Applicant" and to provide the percentage ownership of each. KSO's application disclosed Dora Kuzelka's ownership interest as 51%.

47.     Based on KSO's Second Draw Loan application and the eligibility certifications therein, Itasca Bank and Trust Company electronically submitted information about the application to the SBA, causing the assignment of an SBA loan number and a loan guarantee under the terms

13

of the PPP. On April 14, 2021, Itasca Bank and Trust Company disbursed the loan in the amount of $416,727 to KSO. Based on this loan, the SBA paid Itasca Bank and Trust Company a $12,501 processing fee.

48.    KSO subsequently applied for forgiveness of the Second Draw Loan on June 22, 2022, which caused the submission to the SBA of a Form 3508EZ loan forgiveness application. On this application, Dora Kuzelka, as KSO's Owner, certified that "[t]he information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects."

49.    On June 29, 2022, SBA approved forgiveness of KSO's Second Draw Loan and remitted a payment of $421,820 (consisting of the loan principal amount of $416,727 plus accrued interest) to Itasca Bank and Trust Company.

## COUNT I

**False Claims Act: Presentation of False Claims for Payment) (31 U.S.C. § 3729(a)(1)(A)**

50.    Paragraphs 1 through 49 are incorporated by reference.

51.    By virtue of the acts described above, the defendants knowingly requested and obtained PPP loans that KSO was not entitled to.

52.    The defendants also knowingly requested and received forgiveness of the PPP loans, despite the fact that KSO was not entitled to the loans or loan forgiveness.

53.    By virtue of these false claims, the United States was damaged for the full amount of the PPP loans (with interest) and the processing fees paid to Itasca Bank and Trust Company in connection with KSO's PPP loans, plus any other costs or interest, and is entitled to treble damages under the FCA, plus civil penalties for each false claim.

14

## COUNT II

**False Claims Act: Making or Using False Records or Statements) (31 U.S.C. § 3729(a)(1)(B)**

54.     Paragraphs 1 through 49 are incorporated by reference.

55.     The defendants knowingly created and submitted PPP loan applications and loan forgiveness applications that contained misrepresentations about the criminal charges and criminal history of Dora Kuzelka, KSO's President and owner, and about KSO's eligibility to obtain PPP loans and loan forgiveness.

56.     By virtue of these false records or statements, the United States was damaged for the full amount of the PPP loans (with interest) and the processing fees paid to Itasca Bank and Trust Company in connection with KSO's PPP loans, plus any other costs or interest, and is entitled to treble damages under the FCA, plus civil penalties for each false claim.

## COUNT III

### Unjust Enrichment

57.     Paragraphs 1 through 49 are incorporated by refence.

58.     This is a claim for the recovery of monies by which the defendants have been unjustly enriched.

59.     By obtaining from the United States, through Itasca Bank and Trust Company, PPP funds to which KSO was not entitled, the defendants were unjustly enriched, and the United States is entitled to damages in an amount of the principal and interest amounts of the loans at issue, plus processing fees.

## JURY DEMAND

The United States demands a trial by jury on all issues so triable.

15

## **PRAYER FOR RELIEF**

The United States requests that the court enter judgment against defendants KSO MetalFab, Inc. and Dora Kuzelka the following relief:

(a) on Counts I and II, treble the damages sustained by the United States for the defendants' violations of the False Claims Act, plus the maximum civil penalties allowed by law for each false claim;

(b) on Count III, the amount by which the defendants were unjustly enriched.

(c) pre- and post-judgment interest as allowed by law; and

(d) all other relief to which the United States is justly entitled.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Kurt N. Lindland
    KURT N. LINDLAND
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 353-4163
    kurt.lindland@usdoj.gov

16